# EXHIBIT A to Morson Declaration

# CFTC Order January 29, 2018
# In re Deutsche Bank et al

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC



Office of Proceedings
Proceedings Clerk

11:41 am, Jan   29, 2018

| | |
|---|---|
| In the Matter of:<br><br>Deutsche Bank AG and Deutsche<br>Bank Securities Inc.,<br><br>Respondents. | CFTC Docket No. 18-06 |

## ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 6(c) AND (d) OF THE COMMODITY EXCHANGE ACT, MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

### I.

### INTRODUCTION

The Commodity Futures Trading Commission ("Commission") has reason to believe that Deutsche Bank AG ("DB AG") and Deutsche Bank Securities Inc. ("DBSI") (collectively, "Deutsche Bank" or "Respondents") violated the Commodity Exchange Act (the "Act" or "CEA") and Commission Regulations ("Regulations"). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order"), and acknowledge service of this Order.[1]

---

[1]  Respondents consent to the use of the findings of fact and conclusions of law in this Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof. Respondents do not consent, however, to the use of this Order, or the findings or conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a proceeding in bankruptcy or receivership; or a proceeding to enforce the terms of this Order. Respondents do not consent to the use of the Offer or this Order, or the findings or conclusions in this Order, by any other party in any other proceeding.

## II.

## FINDINGS

The Commission finds the following:

### A. SUMMARY

From at least February 2008 and continuing through at least September 2014 (the "Relevant Period"), DB AG, by and through the acts of certain precious metals traders, engaged in a scheme to manipulate the price of precious metals futures contracts by utilizing a variety of manual spoofing techniques. On numerous occasions throughout the Relevant Period, a number of DB AG precious metals traders in New York, London and Singapore (collectively, the "Traders"), both individually and in coordination with one or more of the others, placed orders to buy or sell gold, silver, platinum and palladium ("precious metals") futures contracts with the intent to cancel the orders before execution. By and through the acts of these Traders, DB AG engaged in unlawful spoofing.

On those occasions, DB AG, by and through the acts of the Traders, intended to, and on some occasions, was able to induce other market participants into buying and selling precious metals futures contracts. In engaging in the unlawful spoofing conduct, DB AG, by and through the acts of the Traders, also intended to manipulate and, on occasion, succeeded in manipulating the prices of the precious metals futures contracts. DB AG, by and through the acts of the Traders, sought to and, on some occasions, did benefit from the artificial prices caused by the manipulation carried out by its Traders, both individually and in coordination, by inducing other market participants to fill the resting orders placed by the Traders at DB AG on the opposite side of the market from the orders that they placed with the intent to cancel before execution.

Separately, on certain other occasions between December 2009 through February 2012, DB AG, by and through the acts of one of the Traders in Singapore, placed orders and executed trades with the intent of manipulating the price of precious metals futures contracts for the purpose of triggering customers' stop-loss orders.[2] This DB AG trader coordinated his trading with another precious metals trader at another large financial institution ("Financial Institution 1"). On certain occasions, the DB AG trader was successful at manipulating the price and triggering the customer-stop loss orders. Intentionally triggering the customer stop-loss orders on some of these occasions allowed the DB AG trader to buy precious metals futures contracts at artificially low prices or sell precious metals futures contracts at artificially high prices for the benefit of his proprietary trading.

Further, in conjunction with the above referenced misconduct, DBSI failed to diligently supervise in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2017).

---

[2] A stop-loss order, or stop order, is an order that becomes a market order when a particular price level is reached. A sell stop is placed below the market; a buy stop is placed above the market.

2

\* \* \* \* \*

In accepting the Offer of Settlement, the Commission recognizes Deutsche Bank's substantial cooperation during the Division of Enforcement's ("Division") investigation of this matter, which is explained in more detail below. The Commission notes that Deutsche Bank's cooperation and remediation, as well as its commitment and effort to resolve this matter, are being recognized in the form of a substantially reduced civil monetary penalty.

### B.   RESPONDENTS

**DB AG** is a German global banking and financial services company headquartered in Frankfurt, Germany. DB AG operates in over seventy countries and has offices in major financial centers, including Frankfurt, London, New York, Tokyo, Singapore and Hong Kong. On December 31, 2012, DB AG was provisionally registered as a swap dealer with the Commission.

**DBSI** is a Delaware corporation with its principal office in New York, New York. DBSI has been registered with the Commission as a futures commission merchant ("FCM") since 1992, and as a Commodity Pool Operator since 2013. DBSI is an indirect wholly-owned subsidiary of DB AG. The precious metals Traders discussed herein executed and cleared trades through DBSI.

### C.   FACTS

During the Relevant Period, Deutsche Bank was engaged in precious metals trading, which included making markets and engaging in proprietary trading in, among other things, precious metals spot and futures markets. As part of Deutsche Bank's business, Traders placed orders and entered into transactions for precious metals futures contracts traded on the Commodity Exchange, Inc. ("COMEX"), a futures exchange and designated contract market which is owned and operated by CME Group, Inc. ("CME"). Deutsche Bank, by and through its Traders, traded gold, silver, platinum and palladium futures both for bank customers and on behalf of the bank.

#### 1.   Spoofing, Manipulation and Attempted Manipulation

DB AG, by and through the acts of the Traders, placed bids or offers on COMEX with the intent to cancel before execution, thus engaging in a scheme to manipulate the price of precious metals futures contracts by utilizing a variety of manual spoofing techniques.

Generally, the Traders placed large bids or offers in the futures market with the intent to cancel before execution (the "spoof orders") after another smaller bid or offer (the "resting order") was placed on the opposite side of the same market. The Traders placed their spoof orders with the intent to create the false appearance of market depth, which the Traders knew would and did create the impression of greater buying or selling interest than would have existed otherwise. The Traders placed such spoof orders with the intent to induce other market participants to fill their resting orders on the opposite side of the market from their spoof orders. The resting orders were often placed as iceberg orders, which are large single orders divided into smaller lots visible to the market, for the purpose of limiting the order quantity shown to the

3

market. In engaging in the spoofing conduct, the Traders also intended to manipulate, and at times succeeded in manipulating the price of the relevant futures contract. Thereafter, the Traders cancelled the spoof orders after the resting orders were filled or when there was too great a risk of the spoof orders being executed.

The DB AG Traders openly and routinely engaged in spoofing in the precious metals futures markets, either individually or in coordination internally with one another. For example, if one Trader had a resting order that was yet to be filled, other Traders on the desk (whether located in the same office or at another location) would be able to see the resting order and placed spoof orders on the opposite side of that order for the purpose of inducing other market participants to fill their colleague's resting orders. In engaging in such misconduct, DB AG, by and through the Traders, placed the spoof orders with the intent to cancel before execution. In addition, DB AG, by and through the Traders, also intended to manipulate and at times succeeded in manipulating the price of the relevant futures contract.

During the Relevant Period, the Traders also discussed their efforts to spoof and manipulate the price of precious metals futures contracts in numerous internal and external chats and electronic messages, as shown in the examples below.

On December 16, 2008, one of the Traders, Trader A, was discussing trading activity in gold futures with another Trader, Trader B. Trader B indicated: "i am bidding futur[e]s at 854 in size." Trader A asked: *"For anyone. Or a spoof?"* Trader B responded: *"spoof."* In response, Trader A stated: *"Don't leave i[t] out too long ... U don't want people leaning on it."* (Emphases added.)

On January 28, 2009, Trader A placed and cancelled a number of bids in order to help his colleague, Trader C, get his resting orders filled. Shortly following that trading activity, Trader A stated to Trader C in a chat that he used spoofing to manipulate the market: *"so glad I could help...got that up 2 bucks...that does show u how easy it is to manipulate it so[me]times."* Trader A commented further: *"that was alot of clicking...i know how to "game" this stuff..."* Trader A then added: *"i f..k the m[ar]k[e]t around a lot...not alot of people...had it figgied out...thats [sic] why i love electronic trading."* (Emphases added.)

Similarly, on January 29, 2009, Trader C and another colleague, Trader D, engaged in coordinated spoofing. Trader D stated in a chat: *"going to sell 2k here... you flashing bids to help me get done?"* Trader C then confirmed: *"yep...just to trigger algorythm* [sic]." (Emphases added.) Shortly after that exchange, Trader D placed an offer to sell gold futures contracts while Trader C placed and cancelled bids to buy gold futures contracts, inducing other market participants to partially fill Trader D's sell order.

On February 11, 2011, another trader, Trader E, wrote to Trader C: *"shall we spoof."* (Emphasis added.) Trader C responded: "sure."

In another example, on March 16, 2011, Trader B asked another trader, Trader F, "can I give you 1k plat[inum] pls ... and 5 k gold." Trader F wrote: "yep." Trader F then asked: "i am selling both ... right?" to which Trader F responded: *"yep ... spoofing it up ... ahem ahem."* (Emphasis added.)

4

In a March 29, 2011 chat, another trader, Trader G, explained his spoofing strategy to a precious metals trader employed by Financial Institution 1, Trader H: *"basically i sold out . . . by just having fake bids . . . [in] the futures ... i just spam bids below ... to clear my offer."* (Emphasis added.) The "fake bids" and "spam bids" Trader G referred to were spoof orders. On that day, Trader G placed an order to sell silver futures contracts. While that order was pending, he placed and quickly cancelled a series of buy orders, with the intent to cancel before execution.

On June 6, 2011, Trader G described his spoofing strategy in a chat with a trader, Trader I, at another financial institution ("Financial Institution 2"). That trader asked Trader G: *"[don't] u have to bid size to push it up . . . since these algos pick up blocks only"*? Trader G replied: *"i do...i just spam...then cancel the lot...it gets the job done."* (Emphases added.)

In another example, on July 20, 2011, Trader C placed and cancelled a series of buy orders while Trader G had an open sell order in silver. After one of the buy orders placed by Trader C was hit, Trader C placed a sell order of similar size, then Trader C and Trader G both placed and cancelled buy orders. Trader C intended to cancel the buy order before execution, and so he and Trader G reversed it by selling, and placed spoof orders opposite the sell order to induce other market participants to trade. Trader H at Financial Institution 1 noticed the activity and asked Trader G: *"u saw those good offers in silver?"* Trader G replied: *"LOL...yes...it was my colleague...mucking around... just trying to fill my bid."* Trader H then asked: *"he got some kinda spoof program that does that?"* and Trader G replied: *"no comments."* (Emphases added.)

In an August 28, 2012 chat, Trader C discussed precious metals trading with another trader, Trader J. Trader C stated: *"i skewed the quote to the left ... people scared ... we[']ll spoof it ahahaha."* (Emphasis added.)

As reflected in these communications and other evidence, the Deutsche Bank Traders engaged in a scheme to spoof, manipulate and attempt to manipulate the precious metals futures markets.

### 2.    Manipulation and Attempted Manipulation Relating to Stop Loss Orders

On certain other occasions, between December 2009 through February 2012, DB AG, by and through the conduct of Trader G, manipulated and attempted to manipulate the price of precious metals futures contracts to trigger customer stop-loss orders in the market in order to obtain a profit on proprietary trading. Trader G coordinated this trading with Trader H at Financial Institution 1.

On certain occasions, a customer had a stop-loss order placed through Deutsche Bank, and Trader G coordinated with Trader H at Financial Institution 1 to place orders and execute trades to push the price up or down, as needed, in the precious metals futures markets to trigger the customer's stop-loss order. On other occasions, Trader G would communicate with Trader H at Financial Institution 1 to determine the level in the market that customer stop-loss orders were resting at Financial Institution 1, and would coordinate their trading also for the purpose of triggering the customer's stop-loss orders. Trader G engaged in this conduct intending to manipulate the prices of the precious metals futures contracts. Trader G executed trades with the understanding that he had the ability to affect or influence prices. In certain instances, Trader G

5

succeeded in manipulating the prices of the precious metals futures contracts. Trader G was able to benefit from the manipulation by buying or selling futures contracts at prices that were artificially high or low, to the detriment of the customers whose stop loss orders were triggered.

Trader G and Trader H at Financial Institution 1 regularly discussed their stop-loss manipulation strategies and efforts. Below are several examples of such chats.

On November 18, 2010, Trader G told Trader H: "*[I] have chunky stop at 27.35 ... keep to urself.*" Trader H told Trader G: "*go get that chunky monkey,*" to which Trader H responded: "*i am*" and asked Trader H: "*u wanna come on boar[d]?*" Trader H agreed and wrote: "*I'll get a 40 print for you.*" Trader G responded by calling them "*the hunt brothers.*" In response, Trader H wrote: "*chill man, they went to jail.*" (Emphases added.)

In another example, on January 7, 2011, Trader G asked Trader H at Financial Institution 1, via a chat, about the level in the market at which customer stop loss orders were resting. Trader G told Trader H: "where are [yo]ur stops ... i can hunt with u." A few minutes later, Trader H asked Trader G: "*yo can u help me push silver down?... im stuck with this stop damnit ... need a 72 print.*" Trader G agreed to execute trades to push the price of COMEX silver futures market down to trigger the resting stop loss orders, and did so by entering orders to sell with the intent to manipulate prices. When the market reached the stop level that they were seeking, Trader G told Trader H: "there u go." After the trading sequence, Trader G wrote to Trader H: "*i practice my hammer well right,*" to which Trader H commented: "*i just need a 72 print haha, u really butched it.*" (Emphases added.)

On January 19, 2011, Trader H told Trader G that he intends to get a "43 print" in platinum and tells him to "go long the plat[inum]." Trader G responded: "loaded up some," and bought platinum futures contracts. Trader G then told Trader H: "*i help u print it.*" A few minutes later, Trader H wrote: "get ready," and Trader G responded: "*let me know ... when to let the proton cannon loose.*" Shortly thereafter, Trader H wrote: "steady ... steady ... ok lets go." Trader G then bought more platinum futures contracts and wrote: "*that was for the print ... can sell u back.*" (Emphases added.)

On March 29, 2011, Trader H asked Trader G for assistance in the gold futures market, asking Trader G to "*push it up*" because Trader H "*need[ed] a print.*" Trader G bought gold futures contracts with the intent to push prices up as requested. Immediately after Trader G's manipulative trading, Trader H told Trader G that he "*got it*" [i.e., the print]. A few minutes later, Trader H offered to sell Trader G gold futures contracts at an advantageous price "*cause u helped me for the print.*" (Emphases added.)

On March 31, 2011, Trader H wrote: "morning bro ... just got in," and Trader G wrote to Trader H about Trader G's gold trading that morning: "*[I]was trying to gun on my own [stop] ... for 1427.*" (Emphases added.)

On August 11, 2011, Trader G and Trader H were discussing coordination of stop loss manipulation and Trader G wrote: "the 1 lot offer ... is so powerful ... i love it." Trader H responded: "*it depends what kinda mkt ... sometimes u use muscle ... sometimes u use blade ...*

6

*this is blade ... but then two guys doing it like this together is small muscle and blade.*" Trader G responded: "*yeah ... dude ... i like it ... double dragon.*" (Emphases added.)

As reflected in these communications and other evidence, Trader G colluded with and coordinated his trading with Trader H at Financial Institution 1, in order to manipulate and attempt to manipulate the precious metals futures markets.

### 3. DBSI Failed to Diligently Supervise

Although DBSI maintained systems and policies designed to detect and deter spoofing during the Relevant Period, it failed to perform its supervisory duties diligently. Specifically, during the Relevant Period, among other things, Deutsche Bank promulgated policies prohibiting Deutsche Bank traders from engaging in market manipulation and spoofing, and provided training on those policies to its employees, including the Traders. In addition, DBSI put in place an electronic surveillance system to monitor trading patterns in order to detect potential spoofing in precious metals futures contracts by its traders. The surveillance system identified several hundred instances of potential spoofing by Deutsche Bank traders, including several of the Traders identified herein. However, DBSI failed to perform its supervisory duties diligently. While its surveillance system identified specific instances of potential misconduct, DBSI did not follow up on the majority of potential instances of misconduct identified by its electronic surveillance system. DBSI also failed to perform its supervisory duties diligently because the surveillance systems alerts put it on notice of potential misconduct yet it failed to take adequate steps to address or remedy the issues.

### 4. Deutsche Bank's Cooperation and Remediation

During the course of the Division's ongoing investigation of potential misconduct in precious metals at Deutsche Bank, Deutsche Bank commenced an internal investigation. That Deutsche Bank internal investigation revealed spoofing misconduct by Traders on the precious metals desk, which Deutsche Bank promptly disclosed to the Division.

Among other things, Deutsche Bank provided the Division timely updates on its internal investigation on a rolling basis, and expeditiously and completely responded to Division Staff's requests for information; disclosed information to the Division proactively, rather than reactively, and attributed the facts to specific sources for Division Staff; disclosed to the Division pertinent facts relevant to that misconduct, including facts related to involvement of individuals; identified specific documents in its productions that were particularly relevant to the misconduct at issue, and provided the Division information relating to the provenance of the documents; and assisted the Division in analyzing trading data.

Deutsche Bank also proactively worked to remediate and enhance its compliance systems and policies related to spoofing in precious metals futures contracts, and futures contracts generally. Finally, Deutsche Bank worked toward resolution from an early stage in the investigation.

Due to Deutsche Bank's substantial cooperation, its significant remediation and its prompt and continued efforts to resolve this matter, the civil monetary penalty imposed by the Commission has been substantially reduced from the otherwise applicable penalty.

7

## III.

## LEGAL DISCUSSION

**A.   Manipulation and Attempted Manipulation of the Price of Precious Metals Futures Contracts, in Violation of Section 9(a)(2) of the Act; Sections 6(c) and 6(d) of the Act (for Conduct Occurring Prior to August 15, 2011); and Sections 6(c)(1), 6(c)(3) and 6(d) of the Act and Regulations 180.1 and 180.2 (for Conduct Occurring On or After August 15, 2011)**

Together, Sections 6(c),[3] 6(d) and 9(a)(2) of the Act prohibit acts of manipulation and attempted manipulation. 7 U.S.C. §§ 9, 13b, 13(a)(2) (2012). Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2) (2012).

For conduct prior to August 15, 2011, Section 6(c) and (d) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, . . . or otherwise is violating or has violated any of the provisions of [the] Act." 7 U.S.C. §§ 9, 13b (2006).

For conduct occurring on or after August 15, 2011, the Commission is authorized to serve a complaint and impose penalties and cease and desist orders with regard to manipulation and attempted manipulation in violation of the broader amended provisions of Sections 6(c)(1) and 6(c)(3) of the Act, 7 U.S.C. § 9(1), (3) (2012), and the Regulations implementing those provisions. Section 6(c)(1) of the Act prohibits the use or attempted use of any manipulative device in connection with any swap or contract of sale of any commodity in interstate commerce, or for future delivery, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1), 17 C.F.R. § 180.1(a)(1) (2017), makes it "unlawful . . . , directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to . . . (1) [u]se . . . or attempt to use . . . any manipulative device, scheme or artifice to defraud . . . ." Section 6(c)(3) of the Act prohibits the manipulation or attempted manipulation of the price of any commodity in interstate commerce, 7 U.S.C. § 9(3) (2012), and Regulation 180.2, 17 C.F.R. § 180.2 (2017), makes it "unlawful . . . directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

As described above, DB AG, by and through the acts of the Traders, manipulated and attempted to manipulate the price of precious metals futures contracts by utilizing a variety of

---

[3]   Section 6(c) was amended effective August 15, 2011.

8

manual spoofing techniques, in violation of: Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2012); Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9, 13b (2006), for conduct occurring prior to August 15, 2011; and Sections 6(c)(1), 6(c)(3) and 6(d) of the Act, 7 U.S.C. §§ 9(1), 9(3), 13b (2012), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2017), for conduct occurring on or after August 15, 2011.

Furthermore, DB AG, by and through the acts of Trader G, manipulated and attempted to manipulate the price of precious metals futures contracts by engaging in scheme to trigger customer stop-loss orders, in violation of: Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2012); Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9, 13b (2006), for conduct occurring prior to August 15, 2011; and Sections 6(c)(1), 6(c)(3) and 6(d) of the Act, 7 U.S.C. §§ 9(1), 9(3), 13b (2012), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2017), for conduct occurring on or after August 15, 2011.

### B. Spoofing in the Precious Metals Futures Markets, in Violation of Section 4c(a)(5)(C) of the Act

Section 4c(a)(5) of the Act makes it unlawful for "[a]ny person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5)(C) (2012). *See also United States v. Coscia*, 866 F.3d 782, 793 (7th Cir. 2017) (holding that because the CEA clearly defines spoofing, it provides adequate notice of prohibited conduct).

As described above, DB AG, by and through the acts of the Traders, entered bids or offers on a registered entity with the intent to cancel the bids or offers before execution, in violation of Section 4c(a)(5)(C) of the Act. *See, e.g., In re Posen*, CFTC No. 17-20, 2017 WL 3216576, at *2 (July 26, 2017) (consent order) (manual trader "entered into thousands of bids or offers on a registered entity with the intent to cancel the bids or offers before execution in violation of Section 4c(a)(5)(C) of the Act"); *CFTC v. Oystacher*, 203 F. Supp. 3d 934, 942 (N.D. Ill. 2016) (denying motion for judgment on the pleadings, holding that allegations of placing "both bids and offers with the intent to cancel those bids or offers before execution" constitutes "trading behavior [that] falls within the Spoofing Statute's defined prohibition"); *CFTC v. Nav Sarao Futures Ltd.*, No. 15-3398, 2016 WL 8257513, at *10 (N.D. Ill. Nov. 14, 2016) (consent order) (finding that defendants engaged in spoofing techniques by, among other things, "plac[ing] tens of thousands of bids and offers for the E-Mini S&P contract with the intent of cancelling those bids and offers before execution (i.e., Spoof Orders)"); *CFTC v. Khara*, No. 15-CV-03497, ECF 35 at 6 (S.D.N.Y. Mar. 31, 2016) (consent order) (finding that "Defendants ... engaged in unlawful disruptive trading practices or conduct in the gold and silver futures markets ... that were, were of the character of, or were commonly known to the trade as 'spoofing' (bidding and offering with the intent to cancel the bid or offer before execution)").

### C. Regulation 166.3 – Failure To Supervise

Regulation 166.3, 17 C.F.R. § 166.3 (2017), requires that every Commission registrant "diligently supervise the handling by its partners, officers, employees and agents" of all activities relating to its business as a registrant. Regulation 166.3 imposes upon a registrant an affirmative duty to supervise its employees and agents diligently by establishing, implementing and executing an adequate supervisory structure and compliance program. *See CFTC v. Carnegie Trading Grp., Ltd.*, 450 F. Supp. 2d 788, 805 (N.D. Ohio 2006); Adoption of Customer Protection Rules, 43 Fed. Reg. 31,886, 31889 (July 24, 1978). For a registrant to fulfill its duties under Regulation 166.3, it must both design an adequate program of supervision and ensure that the program is followed. *See, e.g., In re GNP Commodities, Inc.*, CFTC No. 89-1, 1992 WL 201158, at *17-19 (Aug. 11, 1992), *aff'd sub nom. Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993).

A violation of Regulation 166.3 is an independent violation for which no underlying violation is necessary. *See GNP Commodities*, 1992 WL 201158, at *17 n.11; *In re Paragon Futures Ass'n*, CFTC No. 88-18, 1992 WL 74261, at *13 (Apr. 1, 1992). Consequently, a violation of Regulation 166.3 "is demonstrated by showing either that: (1) the registrant's supervisory system was generally inadequate, or (2) the registrant failed to perform its supervisory duties diligently." *In re FCStone, LLC*, CFTC No. 15-21, 2015 WL 2066891, at *3 (May 1, 2015) (consent order) (*citing In re Murlas Commodities*, CFTC No. 85-29, 1995 WL 523563, at *9 (Sept. 1, 1995)); *see also Paragon*, 1992 WL 74261, at *14 (concluding that the "focus of any proceeding to determine whether Rule 166.3 has been violated will be on whether such review occurred and, if it did, whether it was 'diligent'"). Whether a registrant has met its supervisory duties is a fact-intensive determination. *See, e.g., GNP Commodities*, 1992 WL 201158, at *17.

DBSI, a registered FCM, failed to fulfill its duties to supervise under Regulation 166.3 during the Relevant Period. While its surveillance practices identified specific instances of potential misconduct, aspects of DBSI's supervisory system were generally inadequate because it did not review potential instances of misconduct identified by its electronic surveillance system. DBSI also failed to perform its supervisory duties diligently, because it was aware of potential misconduct yet failed to take any steps to address or remedy the issues.

### D. DB AG Is Liable for the Acts of Its Agents

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), provide that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust." Pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014).

The acts, omissions, and failures of the Traders occurred within the course and scope of their employment, office, or agency with DB AG; therefore, pursuant to Section 2(a)(1)(B) of the

Act, and Regulation 1.2, DB AG is liable for the acts, omissions, and failures of the Traders in violation of the provisions of the Act and Regulations cited above.

## IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Deutsche Bank violated the Act and Regulations, as follows:

(i) DB AG manipulated and attempted to manipulate prices, in violation of: Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2012); Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9, 13b (2006), for conduct occurring prior to August 15, 2011; and Sections 6(c)(1), 6(c)(3) and 6(d) of the Act, 7 U.S.C. §§ 9(1), 9(3), 13b (2012), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2017), for conduct occurring on or after August 15, 2011;

(ii) DB AG engaged in spoofing in the precious metals futures markets in violation of Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), for conduct occurring on or after July 16, 2011; and

(iii) DBSI failed to supervise, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2017).

## V.

## OFFER OF SETTLEMENT

Respondents have submitted the Offer in which they:

A. Acknowledge receipt of service of this Order;

B. Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C. Waive:

1. The filing and service of a complaint and notice of hearing;

2. A hearing;

3. All post-hearing procedures;

4. Judicial review by any court;

5. Any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

  6. Any and all claims that it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. pt. 148 (2017), relating to, or arising from, this proceeding;

  7. Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-874 (codified as amended in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this proceeding; and

  8. Any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D. Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E. Requests, for the reasons set forth in Respondents' letter dated January 3, 2018 ("Request Letter"), that the Commission advise that, under the circumstances, disqualification under Rule 262(a) of Regulation A and Rule 506(d)(1) of Regulation D of the Securities & Exchange Commission ("SEC"), 17 C.F.R. §§ 230.262(a), 230.506(d)(1) (2017), should not arise as a consequence of this Order;

F. Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

  1. Makes findings by the Commission that:

   (i) DB AG manipulated and attempted to manipulate prices in violation of: Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2012); Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9, 13b (2006), for conduct occurring prior to August 15, 2011; and Sections 6(c)(1), 6(c)(3) and 6(d) of the Act, 7 U.S.C. §§ 9(1), 9(3), 13b (2012), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2017), for conduct occurring on or after August 15, 2011;

   (ii) DB AG engaged in spoofing in the precious metals futures markets in violation of Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), for conduct occurring on or after July 16, 2011; and

   (iii) DBSI failed to supervise, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2017);

  2. Orders Respondents to cease and desist from violating the Act and Regulations, as set forth below;

  3. Orders Respondents to pay, jointly and severally, a civil monetary penalty in the amount of thirty million dollars ($30,000,000), within ten (10) days of the date of entry of this Order. If the CMP Obligation is not paid in full within ten (10) days

of the date of entry of the Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of the Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961 (2012).

4. Orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order; and

5. Advises that, under the circumstances, disqualification under Rule 262(a) of Regulation A and Rule 506(d)(1) of Regulation D of the SEC should not arise as a consequence of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VI.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A. Respondents and their successors and assigns shall cease and desist from violating:

1. Sections 6(c)(1), 6(c)(3), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(3), 13(a)(2), 13b (2012), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2017);

2. Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012); and

3. Regulation 166.3, 17 C.F.R. § 166.3 (2017).

B. Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of thirty million dollars ($30,000,000) ("CMP Obligation"), within ten (10) days of the date of the entry of this Order. If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> DOT/FAA/MMAC/AMZ-341

CFTC/CPSC/SEC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
(405) 954-7262 office
(405) 954-1620 fax
marie.thorn@faa.gov

If payment is to be made by electronic funds transfer, Respondents shall contact Marie Thorn or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondents and the name and docket number of this proceeding. The paying Respondents shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C. Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1. <u>Public Statements</u>: Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents': (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

2. <u>Procedures and Controls to Detect Spoofing Activity</u>: Respondents shall maintain systems and controls reasonably designed to detect spoofing activity by its traders, such as the systems and controls Respondents developed and implemented in response to the Traders' spoofing activity. These systems and controls shall, at a minimum, be designed to detect and generate a report regarding patterns of trading that might constitute spoofing activity. Respondents' personnel shall promptly review such reports and follow up as necessary to determine whether spoofing activity has occurred.

3. <u>Training</u>: Respondents shall maintain their training program that provides training, at least annually, addressing the legal requirements of the Act with regard to spoofing, manipulation and attempted manipulation, to be given to all employees trading on behalf of Respondents or other affiliated entities who submit any orders on futures markets, and their supervisors.

4. <u>Cooperation with the Commission</u>: Respondents shall continue to cooperate fully and expeditiously with the Commission, including the Division, in this action, and in any current or future Commission investigation or action related thereto. Respondents shall also cooperate with the Commission in any investigation, civil litigation, or administrative matter related to, or arising from, this action. As part of such cooperation, Respondents agree to:

   i. preserve and produce to the Commission in a responsive and prompt manner, as requested by Division Staff, all non-privileged documents, information, and other materials wherever located, including but not limited to audio files, electronic communications, and trading records and data, in the possession, custody, or control of Respondents;

   ii. comply fully, promptly, completely and truthfully, subject to any legally recognized privilege, with any inquiries or requests for information and documents by the Commission;

   iii. identify and authenticate relevant documents and other evidentiary materials, execute affidavits or declarations, and provide a corporate representative to testify completely and truthfully at depositions, trial, and other judicial proceedings, when requested to do so by the Division Staff;

   iv. use its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of Deutsche Bank, regardless of the individual's location and at such a location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial or investigation; and

   v. subject to applicable laws and regulations, use their best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of Deutsche Bank.

5. <u>Prohibited or Conflicting Undertakings</u>: Should the Undertakings herein be prohibited by, or be contrary to, the provisions of any obligations imposed on Respondents by any presently existing, or hereinafter enacted or promulgated laws, rules, regulations, or regulatory mandates, then Respondents shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, Respondents will abide by the obligations imposed by the laws, rules, regulations, and regulatory mandates. Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's

Regulations promulgated thereunder, including, but not limited to, Regulations 1.31 and 1.35, 17 C.F.R.§§ 1.31, 1.35 (2017), in effect now or in the future.

6. Partial Satisfaction: Respondents understand and agree that any acceptance by the Commission of any partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

D. Based on the nature of the violations; the findings made, and the sanctions, conditions, and undertakings imposed in the Order; and the facts and representations in Respondents' Request Letter, the Commission advises[4] that, under the circumstances, disqualification under Rule 262(a) of Regulation A and Rule 506(d)(l) of Regulation D of the SEC, 17 C.F.R. §§ 230.262(a), 230.506(d)(1) (2017), should not arise as a consequence of this Order.[5]

---

[4] Rule 506(d)(l)(iii)(B) disqualifies an issuer from relying on the private offering exemptions provided for in Rule 506 if they or certain related parties are "subject to a final order of . . . [*inter alia*] the U.S. Commodity Futures Trading Commission . . . that: . . . [c]onstitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct." Rule 506(d)(2)(iii), however, provides that disqualification "shall not apply" if the CFTC "advises in writing" that disqualification under Rule 506(d)(1) "should not arise as a consequence of such order." *See also* 17 C.F.R. §§ 262(a)(3)(ii), (b)(3) (parallel provisions under Regulation A); SEC, Exemptions to Facilitate Intrastate and Regional Securities Offerings, 81 Fed. Reg. 83,494, 83,545 (Nov. 21, 2016) (stating that disqualification under Rule 504 arises "absent a waiver or other exception provided in Rule 506(d)").

[5] In providing this advice, the Commission considered factors similar to those considered by the SEC when it issues waivers of disqualification under Regulation A and Regulation D. The SEC grants waivers where an applicant has shown "good cause and . . . if the [SEC] determines that it is not necessary under the circumstances that the exemptions be denied," 17 C.F.R. §§ 230.262(b)(2), 230.506(d)(2)(ii), based on its analysis of how the identified misconduct bears on the applicant's fitness to participate in offerings exempted under Regulation A and Regulation D. *See* SEC, Div. of Corp. Fin., *Waivers of Disqualification Under Regulation A and Rules 505 and 506 of Regulation D*, https://www.sec.gov/divisions/corpfin/guidance/disqualification-waivers.shtml; SEC, Div. of Corp. Fin., *Rule 504 of Regulation D: A Small Entity Compliance Guide for Issuers*, https://www.sec.gov/divisions/corpfin/guidance/rule504-issuer-small-entity-compliance.html. The SEC considers the following primary factors in determining whether to grant a waiver request: (i) the nature of the violation and whether it involved the offer or sale of securities; (ii) whether the violation required scienter; (iii) who was responsible for the misconduct; (iv) what was the duration of the misconduct; (v) what remedial steps have been taken; and (vi) the impact on the party seeking a waiver and third parties if a waiver is denied. Respondents' Request Letter addressed these factors in the context of this Order.

The Commission considers these factors in the context of the markets it regulates, and also takes into account whether it determined that a statutory disqualification under the Act should arise solely based on the misconduct found herein and leading to disqualification under Regulation A and Regulation D. The Commission is guided by waivers granted by the SEC in prior cases involving similar facts and circumstances. *See, e.g., In re JPMorgan Chase Bank, N.A.*, Securities Act Release No. 9993, 2015 WL 9256636 (Dec. 18, 2015) (SEC order determining that good cause had been shown that it was not necessary to deny reliance on the exemption under Rule 506 of Regulation D, where disqualification had been triggered by a CFTC order relating to JPMCB's failure to adequately disclose certain conflicts of interest to clients); *In re UBS AG*, Securities Act Release No. 9787, 2015 WL 2395516 (May 20, 2015) (SEC order determining that good cause had been shown that it was not necessary to deny reliance on the exemption under Rule 506, where disqualification had been triggered by a criminal guilty plea relating to FX

The Commission notes that if the facts are different from those represented, or Respondents fail to comply with the terms of the Order, the Commission may, in its discretion, revisit its advice that disqualification should not arise. The Commission reserves the right, in its sole discretion, to withdraw or otherwise revoke or further condition its advice under those circumstances.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

*[signature]*

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: January 29, 2018

---

benchmark manipulation and noting the entry of parallel CFTC orders); *In re Barclays PLC*, Securities Act Release No. 9786, 2015 WL 2395515 (May 20, 2015) (SEC order determining that good cause had been shown that it was not necessary to deny reliance on the exemption under Rule 506 where disqualification had been triggered by a CFTC order relating to FX benchmark and ISDAFIX manipulation); *see also, e.g., Piper Jaffray & Co.*, SEC No-Action Letter, 2015 WL 4451053 (July 20, 2015) (SEC no-action letter determining that good cause had been show that it was not necessary to deny reliance on the exemptions under Regulation A and Rule 506 of Regulation D, where disqualification had been triggered by an SEC order, and applying the same factors to consideration of waiver for both exemptions).